United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JUAN MANUEL VALDEZ,                          No. C-00-04733 MMC

              Petitioner,                    **ORDER GRANTING PETITION FOR
                                             WRIT OF HABEAS CORPUS**
      v.

ROY A. CASTRO, Warden,

              Respondent
_____/

      Before the Court is Juan Manuel Valdez's ("Valdez") petition for a writ of habeas

corpus, pursuant to 28 U.S.C. § 2254, on remand from the Ninth Circuit Court of Appeals.

Pursuant to this Court's order requesting supplemental briefing, Valdez filed a

supplemental memorandum, respondent Roy A. Castro ("Castro") filed a responsive

supplemental memorandum, and Valdez filed a reply.  Having considered all of the papers

filed by the parties, and the record on appeal, the Court rules as follows.

                     **FACTUAL AND PROCEDURAL BACKGROUND**

      Valdez challenges his conviction of murder in the second degree, attempted murder,

and shooting at an occupied building.  In an unpublished decision filed January 29, 1999,

the California Court of Appeal set forth the factual background as follows:

              On April 9, 1993, beginning at around 10:30 p.m., nineteen-year-old
      Valdez drank eight to ten beers.  He drank these beers over a period of a
      couple of hours.  At approximately 1:00 a.m., he and three of his friends
      noticed that a party was underway at a warehouse in Watsonville.  Valdez
      and his friends Gabriel Gonzalez and Jose Luis Mendoza had an altercation

with the bouncer who was monitoring entry to the party.  Mendoza and Gonzalez were involved in a physical confrontation with the bouncer, in which Gonzalez sustained an injury to his head that bled profusely.  The bouncer and other persons at the party told Valdez and his friends to leave.  Valdez said in a "very angry and loud" manner: "Look what you did to my brother, motherfucker.  We're going to get you.  We're going to kill you."  Valdez looked "mean," and he was challenging people to fight.  He spoke "viciously" and clearly "wanted some revenge."  Valdez seemed to believe that one of the partygoers had used a flashlight to hit Gonzalez.  Valdez challenged this partygoer to fight.  The partygoer refused to fight Valdez.  Valdez threatened "I'm going to fucking kill you.  I know who you are.  I'm going to get a gun and come back here and fucking kill you."  He also threatened "I'll be back with the gun to kill you motherfuckers."  Gonzalez and Mendoza said "Yeah, we'll be back with a gun.  We're going to kill you." All three men declared that "We're brown and proud" and threatened that they would be back to kill "all of [you] white motherfuckers."  The three men then got into a car and left.

Valdez and his friends proceeded to a hospital.  On the way to the hospital, Gonzalez asked Valdez "[w]here were you when we were getting our ass kicked."  Valdez was already mad, and this statement made Valdez even more mad.  Valdez insisted that he wanted to return to the warehouse and fight the "bouncer."  Valdez and Mendoza left Gonzalez and their other friend at the hospital.  Valdez directed Mendoza to drive them to a house where Edgar Paul Valencia, one of Valdez's best friends, was staying.  Valdez was still intoxicated and mad.  Valdez awakened Valencia and told him what had happened and that he wanted to go back to the party and fight with "some people."  Valdez told Valencia that they would need protection because "the people at the party were very big."  Either Mendoza or Valdez suggested that they obtain "sticks" for their protection, so they drove to another location and obtained "sticks."  Then they returned to the warehouse.

The bouncer was no longer at the party, and all of the doors to the warehouse had been locked.  Some potential partygoers arrived after the doors were locked and banged on the warehouse's metal door for a few minutes to try to gain admittance.  They did not kick the door too hard because the door seemed so thin that they were afraid of bending it.  No one answered.  Valdez arrived at the warehouse with a tire iron in his hand.  Valencia had a wooden stick in his hand, and Mendoza had some type of metal object in his hand.  Valdez was visibly mad.  He and Mendoza went up to the large 16 feet by 10 feet metal rollup warehouse door and began banging on it with their metal weapons, kicking it, throwing their bodies against it and demanding to be let in.  The banging was strong enough to cause the door to move and shake.  Valdez said "Open the fucking door.  Let us the fuck in.  You'd better let us in.  We're going to fucking kill you all.  Come on out, you chickenshits."  Valdez challenged the occupants of the building to fight and said "We're going to kill you white fuckers" and "We're going to smash all your fucking cars."  Valdez was very angry, violent and "obviously intoxicated."  He struck the door several more times, and he said "[w]e're going to come back and kill you all."  Valdez continued to beat on the door with the tire iron.  The door rattled a lot, and the music inside went off.  Someone inside said "Go home."  This angered Valdez even more, and he banged on the door some more and repeated his threats.  In all, the banging on the door lasted for four minutes.  Valdez also went over to a BMW parked in front of the warehouse and punctured its tires.  Valdez struck another vehicle with his tire iron.  Mendoza and Valencia urged Valdez to leave.  Gonzalez's brother, who was watching these events suggested that Mendoza "ram your fucking car" into the warehouse door.  Mendoza declined to do so,

2

and the three men left.

After leaving the warehouse, Valdez was still mad and wanted to return to the warehouse.  Valdez and Mendoza mentioned Valencia's rifle, and Valencia decided to get his rifle "for protection."  Mendoza drove them to the house where the rifle was stored.  Valencia and Valdez went into the house.  Valencia took his loaded .22 caliber semi-automatic rifle from his bedroom and they returned to the car.  Valencia placed the rifle in the trunk of the car.  When they arrived back at the warehouse, Valencia removed his rifle from the trunk and placed it in the backseat of the car.

Two of the partygoers left the warehouse to check on the safety of their vehicles.  They found their vehicles unscathed.  One of them was holding a flashlight, and the other was holding a three-foot long piece of metal pipe in his left hand.  The two men noticed that another vehicle had had its tires punctured.  While the one holding the flashlight was kneeling beside this vehicle examining the punctured tires, the other man saw Valencia, Valdez and Mendoza returning.  It was about 2:30 a.m.  Valdez and Mendoza were wielding sticks or pipes.  They approached the two partygoers and seemed to be trying to provoke a fight.  They said to the two partygoers "you hurt my friend" and asked the two men to "come out in the street and fight with them."[1]  The two partygoers started to back away.

Valdez made a motion with his hand toward Valencia.  It appeared that Valdez was pointing in the direction from which the three men had come.  Valencia returned to the car and retrieved his rifle.  He was gone for about 30 seconds and returned holding the rifle down by his side.  Valdez was hitting his stick-like weapon against his hand.  Mendoza remained near the road, about a car length behind Valdez.  One of the partygoers told the three men that the bouncer had gone home, and he asked them to leave.  Valencia approached the other partygoer and pointed the rifle at his chest.  Valencia said nothing.  Two or three times, he lowered the rifle and then raised it again.  After doing this, he pointed the rifle at this partygoer steadily.  This partygoer raised his hands "in a passive surrendering motion."  Valdez poked his stick at the same man about a foot away from the man's face.  This man backed away from Valdez, and, with the other partygoer, ran toward the back of the warehouse.  Their entire confrontation with Valdez, Mendoza and Valencia had taken about a minute.

After the two partygoers had run about 10 to 15 feet, they heard about 10 shots being fired.  Valencia fired his rifle at the large metal rollup door at least 11 times from a distance of between 15 and 30 feet.  At least six shots penetrated the rollup door at heights between 21 inches and 68 inches.  This rollup door was 24 thousandths of an inch thick.  Two bullets struck the front wall of the building at about five and a half feet and six and a half feet off the ground.  One bullet struck the back wall of the building.  One person who was dancing inside the warehouse about ten feet from the door was struck by a bullet in the head and killed.  Five others were struck by bullets and injured.

Valencia, Mendoza and Valdez ran to the car, and Mendoza drove away from town.  Valdez took over the driving for a short distance, and then Valencia drove.  At Valencia's direction, Valdez hid the rifle.  Valdez's blood was drawn 18 hours after the shooting and found to contain no evidence of alcohol.

. . . .

---

[1] One of the partygoers was more than six feet tall, like the bouncer, and was holding a flashlight.

1

2          Valencia testified at trial that he got his rifle before they returned to the
       warehouse because he thought he could use it to prevent Valdez getting beat

3      up. He retrieved his rifle from the car because he felt threatened by the two
       partygoers. He denied having had any intent to hurt anyone. He testified that
       he thought the door "was a hard door" and the bullets would "get stuck in the
       door" or bounce off.

4          Valdez presented evidence of his good character for non-violence,
       honesty, truthfulness and trustworthiness. Valdez also testified at trial. He

5      admitted that he had become very mad because of the injury to Gonzalez and
       had wanted to fight the bouncer, but he denied making any verbal threats.

6      Valdez claimed that he obtained Valencia's assistance as "a backup" because
       Valencia "knew how to fight" whereas he had never been in a fight before. He

7      felt he needed such assistance in case other people at the party interfered
       with his desire for vengeance on the bouncer. Valdez testified that he

8      believed that the rifle was being brought to the warehouse solely "for
       protection."

9          At trial, Valdez could recall only two visits to the warehouse; the first
       visit with Gonzalez, and a single visit with Valencia. In his version of the

10     events, the two visits with Valencia were consolidated into a single visit. He
       contended that he had banged on the door merely to try to get the "bouncer"

11     to come out and fight him. Valdez denied having done anything to the BMW's
       tires. He claimed that he had believed that one of the two partygoers was the

12     "bouncer" when he encountered him in front of the warehouse.
       Consequently, he challenged this partygoer to fight. Valdez denied making

13     any "signal" for Valencia to fetch his rifle, and he claimed that he was
       unaware that Valencia was even holding the rifle until he heard the shots. He

14     explained his lack of awareness by placing Valencia behind him throughout
       the altercation with the two partygoers. Valdez expressly denied having

15     intended for "the building to be shot" or for anyone to be hurt. He also denied
       having had any knowledge that Valencia was going to fire the rifle at the

16     building or any person. He asserted that his sole purpose was to "fight the
       bouncer."

17         A [defense] expert on the effects of alcohol testified that alcohol can
       cause a human being to lose the "ability to divide attention" so that the person

18     experiences a sort of "tunnel vision" where he or she is unaware of things that
       a sober person would be aware of. The intoxicated individual may become

19     preoccupied with his or her own thoughts and "ignore everything else." The
       expert also explained that intoxication can cause memory lapses, and such

20     memory losses are likely to be incomplete so that the person remembers
       fragments of the events. Such a memory loss might involve the blending of

21     two events into one. However, a memory loss which is self-serving because
       it eliminates incriminating events is likely to be faked rather than a real

22     memory loss induced by alcohol intoxication.

23  (See People v. Mendoza, No. H012195, slip op. at 2-7 (Cal. Ct. App. Jan. 29, 1999).

24     The charges submitted to the jury were one count of murder in the first degree (Pen.

25  Code § 187), five counts of attempted premeditated murder (Pen. Code §§ 187, 664), and

26  one count of discharging a firearm at an occupied building (Pen. Code § 246), all with

27  additional arming allegations (Pen. Code § 12022(a)(1), (b)). The trial court instructed the

28  jury on aiding and abetting, using the state standard instruction, CALJIC 3.01:

4

> A person aids and abets the commission or attempted commission of a crime when he or she with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging or facilitating the commission of the crime by act or advice aids, promotes, encourages or instigates the commission of a crime.

RT 10276.  The trial court later instructed the jury on intoxication, using the standard instruction, CALJIC 4.21.1, modified to include the specific crimes alleged:

> Under the law, it is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of being in such condition.
>
> Thus, the crime of shooting at an occupied building in Count 7, or a crime of accessory [and] grossly negligent discharge of a firearm, which are lesser thereto, the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime.  This rule applies in this case only to the crimes of shooting at an occupied building. And the lesser charge of accessory and grossly negligent discharge of a firearm.
>
> However, there is an exception to this general rule, namely, where a specific intent or knowledge is an essential element of a crime.  In such event, you should consider the defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent or knowledge of at the time of the commission of the alleged offense.
>
> Thus, in the crimes of murder and attempted murder charged in Counts 1 through 6, and the lesser crime of voluntary manslaughter, a necessary element is the existence in the mind of the defendant of a certain a specific intent or knowledge which is included in the definition of the crimes set forth elsewhere in these instructions.
>
> If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider the fact in determining whether or not such defendant had such specific intent or knowledge.
>
> . . . [I]f from all the evidence you have a reasonable doubt whether the defendant had such specific intent or knowledge, you must find that the defendant did not have such specific intent or knowledge.

RT 10279-10280.

On November 3, 1993, in the Santa Cruz County Superior Court, a jury convicted Valdez of one count of second degree murder, five counts of attempted murder without premeditation, and one count of shooting at an occupied building.  As to each count, a non-personal arming allegation was found true.  The convictions were based on Valdez's role as an aider and abettor of Valencia, the person who actually fired the gun.  On January 21, 1994, Valdez was sentenced to state prison for an indeterminate term of 15 years to life on

5

the second degree murder count, the one-year term for the arming enhancement to be served consecutively to the indeterminate term; the sentences on the other charges were imposed to run concurrently therewith.

Valdez appealed his convictions to the California Court of Appeal on several grounds, one of which was that the trial court prejudicially erred by refusing to instruct the jury that evidence of his intoxication was relevant to the intent element of aiding and abetting.  The Court of Appeal affirmed Valdez's conviction on November 18, 1996, holding that former California Penal Code § 22(b) did not permit admission of evidence of voluntary intoxication to disprove the intent element of aiding and abetting.  (See Petition For Writ Of Habeas Corpus ("Pet."), App. A, People v. Mendoza, No. H012195, slip op. at 1-5 (Cal. Ct. App. Nov. 18, 1996) (Bamattre-Manoukian, J., concurring).)  After granting rehearing, the Court of Appeal affirmed its prior ruling on May 23, 1997.  (See Pet., App. C, People v. Mendoza, No. H012195, slip op. at 1-22 (Cal. Ct. App. May 23, 1997) (Bamattre-Manoukian, J., concurring).)[2]

The Supreme Court of California granted review and, on August 23, 1998, reversed the Court of Appeal, holding that former § 22(b) permitted the fact-finder to consider evidence of intoxication in determining the knowledge and intent elements of aiding and abetting.  (See Pet., App. E. at 1, People v. Mendoza, 18 Cal. 4th 1114 (1998)).  The Supreme Court explained:

> Awareness of the direct perpetrator's purpose is critical for the alleged aider and abettor to be culpable for that perpetrator's act.  A person may lack such awareness for many reasons, including intoxication.  A person who is actually unaware that his or her noncriminal act might help another person commit a crime should not be deemed guilty of that crime and all of its reasonably foreseeable consequences even if intoxication contributes to, or is the sole reason for, that lack of awareness.
>
> . . . Anyone, including a drunk person, who knowingly and intentionally aids and abets a criminal act is guilty.  Intoxication is relevant only to show the person did not act knowingly and intentionally.

---

[2] In both of the above-referenced decisions of the California Court of Appeal, Justice Bamattre-Manoukian's concurring opinion was joined by Justice Cottle and, thus, constitutes the majority opinion on the issue of instructional error with respect to Valdez.

Id. at 1129-30 (emphases in original).  As the Supreme Court observed, "[i]ntoxication may explain lack of knowledge that someone else intends to commit a criminal act; the lack of knowledge would excuse the person from liability for that act."  See id. at 1130.  For these reasons, the Court concluded that evidence of voluntary intoxication is admissible under former Penal Code § 22(b), and that the jury may consider such evidence with respect to both the defendant's knowledge and intent as an aider and abettor of all crimes charged. See id. at 1131-32.  The Supreme Court cautioned, however:

> Our holding is very narrow.  Defendants may present evidence of intoxication solely on the question whether they are liable for criminal acts as aiders and abettors.  Once a jury finds a defendant did knowingly and intentionally aid and abet a criminal act, intoxication evidence is irrelevant to the extent of the criminal liability.  A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime.  The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable.  In this case, if Valdez intended to aid and abet Valencia in shooting at the occupied building, Valdez will not be allowed to argue that his intoxication prevented him from foreseeing that Valencia might attempt to or actually commit murder.  Intoxication evidence is admissible only to help decide whether the defendant is legally liable for a criminal act, not to show that the act is less criminal because of the intoxication.

Id. at 1133 (citation omitted) (emphases in original).

The Supreme Court remanded the case to the Court of Appeal to determine whether the intoxication instructions given were "prejudicially defective."  See id. at 1134-35.  In so doing, the Supreme Court directed the Court of Appeal to use a two-step process:

> The appellate court should review the instructions as a whole to determine whether it is reasonably likely the jury misconstrued the instructions as precluding it from considering the intoxication evidence in deciding aiding and abetting liability.  Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: "the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant."

Id. at 1134-35 (quoting People v. Humphrey, 13 Cal. 4th 1073, 1089 (1996)).

On remand, in an unpublished opinion filed January 29, 1999, the Court of Appeal found the jury instructions given were defective under state law because there was a reasonable likelihood that the jury would have "misconstrued the instructions as precluding it from considering the intoxication evidence in deciding aiding and abetting liability."  (See

7

Pet., App. F. at 11).  The Court of Appeal found the error harmless, however, based on its

determination that "it is not reasonably probable that the jury's verdict was in any way

affected by the defective intoxication instruction."  (See id.)  As the Court of Appeal

reasoned:

> The only issues to which the intoxication evidence was relevant were Valdez's
> knowledge of Valencia's intent to shoot at the warehouse and Valdez's intent
> to further that purpose.  The evidence of Valdez's knowledge and intent was
> extraordinarily strong.  During their first visit to the warehouse, Valdez
> threatened the partygoers that he would "kill you motherfuckers" and
> repeatedly stated that he was "going to get a gun and come back here and
> fucking kill you."  In Valdez's presence, Gonzalez and Mendoza also
> threatened to return "with a gun" and "kill you."  The three men also
> threatened to kill "all" of the partygoers.  On their second visit to the
> warehouse, Valdez again repeatedly stated that "[w]e're going to fucking kill
> you all" and "[w]e're going to come back and kill you all."  Valdez admitted at
> trial that he knew that Valencia was bringing a rifle with him when they
> returned to the warehouse.  The third visit was free of verbal threats by
> Valdez, but he was seen to make a signal to Valencia which was immediately
> followed by Valencia's retrieval of the rifle from the car.  Valencia then pointed
> the rifle at one of the partygoers at the same time that Valdez was poking a
> stick at the same partygoer's face.  When the partygoer retreated, Valencia
> began firing the rifle.
>
> The evidence presented by Valdez in defense provided no reasonable basis
> for a rejection of the prosecution's strong evidence of Valdez's explicitly
> stated intent. . . .
>
> . . . It is highly probable, on this record, that the jury based its evaluation of
> Valdez's mental state on Valdez's repeated express threats to return to the
> warehouse with a gun and kill "all" of the partygoers.  This evidence was
> highly indicative of his knowledge of and intent to further Valencia's shooting
> at the warehouse upon their return with a gun.  The only defense offered
> against this evidence was Valdez's testimony that he never made any threats.
> Since the threats were heard by numerous witnesses, his denial was not
> remotely credible.  Moreover, the jury's resolution of the question as to
> whether Valdez made these threats could not have been influenced by the
> defective intoxication instructions.  It is not reasonably probable that a rational
> juror would have doubted that Valdez's own repeated statements of his intent
> were an accurate reflection of his mental state simply because there was
> evidence that he was intoxicated when he made the statements and when his
> explicitly stated purpose was later realized.  We are therefore compelled to
> reach the conclusion that the trial court's defective intoxication instructions did
> not prejudice Valdez and do not require reversal.

Id. at 11-13.  The Court of Appeal did not address whether the jury instructions violated

Valdez's rights under the United States Constitution.

Valdez's request for review by the California Supreme Court was denied on May 12,

1999.  On January 10, 2000, the United States Supreme Court denied Valdez's petition for

1   a writ of certiorari.

2        On December 20, 2000, Valdez filed the instant petition for a writ of habeas corpus,

3   pursuant to 28 U.S.C. § 2254, in which he contends the state court's instructions on

4   intoxication were erroneous and violated his rights under the Due Process Clause of the

5   14th Amendment to the United States Constitution.  (See Pet. at 30:1-4.)  In particular,

6   Valdez argues, the instructions precluded the jury from considering the effect of his

7   intoxication on the knowledge and intent elements of the crime of aiding and abetting.

8   Valdez further contends the error was not harmless and warrants habeas relief.

9        In an order filed December 22, 2003 ("Order"), this Court found "the state court

10   violated Valdez's clearly established rights under the Due Clause of the United States

11   Constitution by failing to properly instruct the jury on how to consider evidence of Valdez's

12   intoxication."  (See Order at 16:21-23.)  In particular, "by improperly instructing the jury in a

13   manner that precluded it from considering evidence of Valdez's intoxication, the trial court

14   in effect reduced the prosecution's burden of proving knowledge and intent beyond a

15   reasonable doubt, thus making it easier for the jury to convict Valdez."  (See id. at 15:2-5.)

16   Additionally, the Court found that because "Valdez's primary defense was his lack of

17   knowledge and intent," and "[h]is evidence of his intoxication was part of that defense," the

18   erroneous jury instructions "precluded the jury from fully considering Valdez's defense, thus

19   denying Valdez a 'meaningful opportunity to present a complete defense.'" (See id. at

20   16:11-15 (citing California v. Trombetta, 467 U.S. 479, 485 (1984)).

21        Nonetheless, the Court found, Valdez was not entitled to habeas relief.  (See Order

22   at 22:6-7.)  In so holding, the Court noted that where an erroneous jury instruction results in

23   a constitutional violation, courts must apply the harmless error analysis mandated by

24   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), under which analysis habeas relief is

25   warranted "only where the error had substantial and injurious effect in determining the jury's

26   verdict." (See Order at 16:25-28 (internal quotation and citation omitted).)  Further noting

27   that the California Court of Appeal had applied a state law harmless error standard that the

28   Ninth Circuit has held to be "the equivalent of the Brecht standard under federal law," see

1  Bains v. Cambra, 204 F.3d 964, 971 n.2 (9th Cir. 2000), this Court held habeas relief was

2  appropriate "only if the Court of Appeal's application of the law to the facts was objectively

3  unreasonable." (See Order at 17:7-19.)  Relying on "[t]he considerable quantity and

4  strength of the evidence of Valdez's knowledge and intent," this Court held the California

5  Court of Appeal's decision was not objectively unreasonable, and, accordingly, denied

6  Valdez's petition.  (See id. at 19:9-12, 21:26-22:4.)

7      On appeal, the Ninth Circuit reversed.  See Valdez v. Castro, 155 Fed. Appx. 301

8  (9th Cir. Nov. 23, 2005).  In particular, the Ninth Circuit held, because the California Court

9  of Appeal's harmless error review was not conducted under Chapman v. California, 386

10  U.S. 18 (1967), this Court "erred in applying the objective unreasonableness test of 28

11  U.S.C. § 2254(d) to the state court's decision rather than conducting its own harmless error

12  review under Brecht[.]"  See id. at 302.[3]  The Ninth Circuit remanded the action for the

13  purpose of "conduct[ing] a Brecht analysis in the first instance, informed by input from the

14  parties based on the correct standard."  See id.  After the Ninth Circuit issued its mandate

15  in January 2006, this Court, as noted, sought supplemental briefing from the parties.

16      Thereafter, in an unrelated case, the United States Supreme Court granted certiorari

17  on the following issue: "If constitutional error in a state trial is not recognized by the

18  judiciary until the case ends up in federal court under 28 U.S.C. § 2254, is the prejudicial

19  impact of the error assessed under the standard set forth in Chapman v. California, 386

20  U.S. 18 (1967), or that enunciated in Brecht v. Abrahamson, 507 U.S. 619 (1993)?"  See

21  Fry v. Pliler, 127 S.Ct. 763 (2006).  In the instant petition, Valdez had argued that the Court

22  should apply the Chapman standard, rather than Brecht.  (See Pet. at 38-46.)  On June 11,

23  2007, the Supreme Court held that "in § 2254 proceedings a court must assess the

24  prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial

25  and injurious effect' standard set forth in Brecht, whether or not the state appellate court

26  recognized the error and reviewed it for harmlessness under the 'harmless beyond a

27  ─────────────

28      [3] In so holding, the Ninth Circuit observed that Valdez "fail[ed] to raise a similar issue in the district court," see id., but that respondent had not objected or argued waiver.

1   reasonable doubt' standard set forth in Chapman."  See Fry v. Pliler, 127 S.Ct. 2321, 2328

2   (2007) (internal citations omitted).

3          Accordingly, this Court will review the instant matter under the Brecht standard.

4                                          **DISCUSSION**

5          **A.  Legal Standard**

6          Under Brecht, the Court must determine whether, in light of the record as a whole,

7   the constitutional violation "'had substantial and injurious effect or influence in determining

8   the jury's verdict.'"  See Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328

9   U.S. 750, 776 (1946)).  Habeas relief may not be granted "based on mere speculation that

10  the defendant was prejudiced by trial error; the court must find that the defendant was

11  actually prejudiced by the error."  See Calderon v. Coleman, 525 U.S. 141, 146 (1998).

12         In applying this standard, the proper inquiry is not whether the jurors were "right in

13  their judgment, regardless of the error or its effect upon the verdict"; rather, the issue is

14  "what effect the error had or reasonably may be taken to have had upon the jury's

15  decision."  See Kotteakos, 382 U.S. at 764.  Accordingly, courts may not find an error

16  harmless because the evidence presented at trial, apart from the error, was sufficient to

17  support the conviction.  See Kotteakos, 328 U.S. at 765; see also Taylor v. Maddox, 366

18  F.3d 992, 1017 (9th Cir. 2004) ("In determining whether error was harmless, we do 'not

19  examine whether there was sufficient evidence to support the conviction in the absence of

20  the constitutional error.'") (citation omitted).

21         With respect to which party bears the burden of proof on the issue of harmlessness,

22  the Supreme Court has stated that it is "conceptually clearer for the judge to ask directly,

23  'Do I, the judge, think that the error substantially influenced the jury's decision?' than for the

24  judge to try to put the same question in terms of proof burdens[.]"  See O'Neal v. McAninch,

25  513 U.S. 432, 436-37 (1995).  If the district court is "in grave doubt about the likely effect of

26  an error on the jury's verdict," the district court "should treat the error, not as if it were

27  harmless, but as if it affected the verdict[.]"  See id. at 435.

28  / /

                                              11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B. Harmless Error Analysis**

For the reasons set forth below, the Court finds the instructional error at issue "had substantial and injurious effect in determining or influencing the jury's verdict." See Brecht, 507 U.S. at 637 (internal quotation and citation omitted).

First, Valdez's evidence of intoxication was key to his defense and perhaps his best hope of creating a reasonable doubt as to whether he knew about Valencia's purpose to fire the rifle at the building and whether he intended to further that purpose. The evidence of Valdez's intoxication and its effects was substantial. Valdez testified that he drank between eight and ten beers before the first altercation at the party. (See Castro Answer, Ex. B, Vol. 34 at 8055-59, 8219, 8230.) Scott Smith, a defense witness who was with Valdez during the drinking bout, corroborated this testimony. (See id., Vol. 35 at 8259-260.) Valencia and his girlfriend, Marisol Arizpe, both testified that when Valdez came to pick up Valencia, Valdez was so drunk that it was difficult to understand his speech. (See id., Vol. 27 at 6397-99; id. Vol. 32 at 7656.) Augustin Gonzalez, the brother of Gabriel Gonzalez, testified that when he saw Valdez during Valdez's second visit to the party, Valdez was so intoxicated that he did not recognize Augustin Gonzalez and instead thought he was the bouncer. (See id., Vol. 25 at 5943.) Prosecution witnesses also testified that Valdez was intoxicated during his first two visits to the party. (See id., Vol. 20 at 4536, 4581 (testimony of Mary Plell); id., Vol 25 at 5799 (testimony of David Plell).)

Additionally, Valdez's expert testified that intoxication may cause a person to focus on one thing to the exclusion of his surroundings. (See id., Vol. 35 at 8393, 8400, 8404.) Valdez testified that before the shots were fired, he was facing a person he thought was the bouncer, and told that person he wanted to fight him because he, the "bouncer," had hurt his friend. (See id., Vol. 34 at 8088-8090.) Valdez further testified that he did not tell Valencia to get the gun, that he was unaware that Valencia had left to get the gun, and that

12

the first time he knew that Valencia had the gun with him was after Valdez heard the shots.[4]
(See id. at 8092-93.)  During closing argument, Valdez's counsel expressly argued an
intoxication defense to the jury.  (See Castro Answer, Ex. B, Vol. 39 at 10387-392.)
Specifically, Valdez's counsel argued that throughout the events at issue, and at the time of
the shooting in particular, Valdez was heavily under the influence of alcohol, that he was
focused only on fighting, and that he had no intent to shoot at a building or any person.
(See id.)  He reminded the jury that Valdez's expert had testified that an intoxicated person
often has tunnel vision.  (See id.)  Finally, he argued that "if, drunk or sober, he did not
know [Valencia] was going to shoot, or did not have the particular intent of furthering that
purpose, then he's not guilty.  And if because of intoxication he did not know . . . what a
sober person would have known, he's likely not guilty."  (See id. at 10391.)

        Thus, this is not a case where the erroneous instructions at Valdez's trial with
respect to intoxication related to a defense on which Valdez presented no evidence, or an
issue on which Valdez could not possibly prevail.  See, e.g., Neder v. U.S., 527 U.S. 1, 17,
19 (1999) (holding omission of element of crime from jury instructions harmless under more
stringent Chapman standard where "omitted element was uncontested and supported by
overwhelming evidence"); Toles v. Gibson, 269 F.3d 1167, 1178-79 (10th Cir. 2001)
(holding denial of funding for defense intoxication expert harmless error under Brecht
where "none of the . . . evidence substantiated [the petitioner's] voluntary intoxication
theory").  Rather, had the jury been permitted to consider the effect of Valdez's intoxication
evidence on the knowledge and intent elements of aiding and abetting, a reasonable juror
could well have concluded that Valdez was so intoxicated that he did not know of
Valencia's criminal purpose to shoot at the building or intend to help Valencia achieve that
criminal purpose.

_____

[4] The Court further notes that although Christ testified that he saw Valdez signal
Valencia to get the gun, (see id., Vol. 22 at 5031), de Haan made no mention of such a
signal and testified only that Valencia suddenly walked off and returned with a gun, (see id.,
Vol. 22 at 5073-74, 5097).  Valencia also made no mention of a signal from Valdez, and
testified that he went to get the gun because de Haan was moving towards him holding a
flashlight "like he was going to hit [Valencia]."  (See id. at 7534-35.)

1    Further, by precluding consideration of Valdez's evidence of intoxication, the

2 instructions prevented the jury from evaluating the impact of Valdez's intoxication with

3 respect to the State's evidence as to his threatening remarks.  As noted, the California

4 Court of Appeal found it "highly probable . . . that the jury based its evaluation of Valdez's

5 mental state on Valdez's repeated express threats to return to the warehouse with a gun

6 and kill 'all' of the partygoers."  (See Pet., App. F. at 12-13.)  If the jury had been permitted

7 to consider the effect of Valdez's intoxication on the intent element of aiding and abetting,

8 the jury reasonably could have found those remarks constituted drunken bravado, rather

9 than real threats he intended to carry out.

10    The Ninth Circuit has found harm, and granted habeas relief, based on errors that

11 similarly eviscerated a key defense.  See, e.g., Gill v. Ayers, 342 F.3d 911, 922 (9th Cir.

12 2003) (holding exclusion of defendant's testimony at Three Strikes sentencing hearing not

13 harmless under Brecht because excluded testimony, if believed, would have refuted

14 existence of prior strike; finding defendant's testimony "was not only central to his defense,

15 it was his only defense"); DePetris v. Kuykendall, 239 F.3d 1057, 1063 (9th Cir. 2001)

16 (holding erroneous exclusion of journal evidence that corroborated petitioner's testimony as

17 to state of mind not harmless under Brecht; holding exclusion "had a substantial and

18 injurious effect on the verdict . . . [because] petitioner's state of mind was the critical issue

19 at trial"); cf. Sanna v. Dipaolo, 265 F.3d 1, 15 (1st Cir. 2001) (finding any error in

20 intoxication instructions harmless under Brecht because "petitioner premised his defense

21 on a claim of mistaken identity" and, thus, "it [was] highly unlikely that the challenged

22 instructions had the slightest impact on the jury's deliberations").

23    Accordingly, the petition will be granted.

24                            **CONCLUSION**

25    For the reasons set forth above, Valdez's petition for a writ of habeas corpus is

26 hereby GRANTED.  Respondent shall release petitioner from custody, unless, within ninety

27 days of the filing of this order and entry of judgment thereon, respondent has filed an

28 / /

14

1 | appeal with the United States Court of Appeals for the Ninth Circuit or the State has set a

2 | date for a new trial.

3 | **IT IS SO ORDERED.**

4 | Dated: July 9, 2007

MAXINE M. CHESNEY
United States District Judge